UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVEN WES FARRISH,<br><br>        Petitioner,<br><br>    v.<br><br>STU SHERMAN, et al.,<br><br>        Respondents. | Case No.  14-cv-01263-EMC<br><br>**ORDER DENYING AMENDED PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Docket No. 18 |

In March 2010, a jury found Petitioner Steven Wes Farrish guilty of the murder of Tiyani Cole and the attempted murder of Dashawn Smith.  *See* Docket No. 24-12 (RT at 2584-85).  Mr. Farrish appealed his conviction in state court and, after his appeal was denied, filed a petition for a writ of habeas corpus with this Court.  *See* 28 U.S.C. § 2254.  Mr. Farrish then moved for, and was granted, a stay of proceedings in this case so that he could exhaust an additional claim in state court.  After Mr. Farrish sought and was denied relief in state habeas proceedings, proceedings in this Court were reopened, and Mr. Farrish filed with this Court an amended habeas petition.  The amended petition is currently pending before the Court.  Having considered the papers submitted and the accompanying record evidence, the Court hereby **DENIES** Mr. Farrish's request for habeas relief.

## I.    FACTUAL & PROCEDURAL BACKGROUND

Mr. Farrish was convicted based on events that took place in Richmond, California, in May 2008.  The testimony at his trial has been summarized by the California appellate court in its decision *People v. Farrish*, No. A129772, 2012 Cal. App. Unpub. LEXIS 6911 (Cal. Ct. App. Sept. 24, 2012).  To wit: On the afternoon of May 12, 2008, police officers were dispatched to the Hilltop neighborhood of Richmond to investigate reports of a shooting.  Officers discovered the

body of Mr. Cole – also known as "Slim" – in the side yard of a house at 2993 Gilma.

Mr. Cole's mother, Cassandra McElveen, was at the scene shortly after the shooting. As she was speaking to a police officer, she saw a car drive by with Mr. Smith sitting in the front passenger seat. Because she knew that Mr. Smith had been with Mr. Cole earlier in the day, she alerted the officer who then stopped the car and spoke to Mr. Smith. Mr. Smith told the officer that he and Mr. Cole had been walking near the intersection of Shane and Groom when Mr. Farrish drove by in a black vehicle. According to Mr. Smith, Mr. Farrish stopped the car, got out, and started shooting at him and Mr. Cole. Mr. Smith and Mr. Cole ran away together for a while but then split up. Upon learning that Mr. Cole had been killed, Mr. Smith broke down crying. Mr. Smith told Mr. Cole's mother that Mr. Farrish had been shooting at them. Mr. Smith told the police that he could pick the shooter out of a photo lineup. The police then handcuffed Mr. Smith and put him in the back of a patrol car so that bystanders would not think that he was "snitching."

Mr. Smith was taken to a police station where he was interviewed. His interview was video recorded. During the interview, Mr. Smith stated that he and Mr. Cole had seen Mr. Farrish at a local McDonald's. Later, as Mr. Smith and Mr. Cole were walking in the Hilltop neighborhood, a black car came by with Mr. Farrish in the driver's seat and another man in the passenger's seat. Mr. Farrish got out and fired multiple shots at Mr. Smith and Mr. Cole. Mr. Smith and Mr. Cole ran away together for about a block but then separated. Mr. Smith hid in a back yard on Gilma. A short time later, Mr. Smith heard more gunshots. Mr. Smith had his girlfriend pick him up, and they drove by the scene where he was stopped by the police. According to Mr. Smith, at the time of the shooting, neither he nor Mr. Cole was carrying a gun, although Mr. Cole had in the past. Mr. Smith added that Mr. Cole carried on his person a .45-caliber bullet as a kind of good-luck charm.

At the end of the police interview, Mr. Smith identified Mr. Farrish as the shooter from a photo lineup. When asked why Mr. Farrish might have shot at them, Mr. Smith indicated that it was related to Mr. Farrish's brother, Joe, being put in jail for shooting someone and Mr. Cole's brother snitching on Joe.

At trial, the prosecution called upon Mr. Smith to testify. In contrast to what he had told

Mr. Cole's mother and the police, Mr. Smith now claimed ignorance with respect to significant details on the day of the shooting, including who the shooter was. The prosecution, therefore, played the video-recorded interview of Mr. Smith, taken on the day of the shooting.

At trial, the prosecution also offered two eyewitnesses who were at or close to the scene. One witness was a bus driver who had stopped her bus at the corner of Shane and Groom. She saw Mr. Smith and Mr. Cole running but did not see either one carrying a gun. She also saw a black car and a gun poking out the driver's side window. The car went down Gilma and she heard gunshots moments later. The other witness lived on Gilma and heard gunshots as he was getting into his car. He saw Mr. Smith and Mr. Cole running and then splitting up. Like the bus driver, the witness did not see either one carrying a gun. The witness started to drive when he saw a black car coming around the corner. The car stopped in the middle of the street, near 2993 Gilma, and the witness heard gunshots.

The police examining the crime scene found no guns near Mr. Cole's body or along the route where he and Mr. Smith had run. Near the corner of Shane and Groom, the police found one spent nine-millimeter casing and an unfired .45-caliber cartridge. At 2993 Gilma, the police found bullet impact points in a wooden fence and on or near the front porch, as well as some bullet fragments around the house. All the bullets and holes were consistent with medium-caliber ammunition, such as a nine-millimeter, and inconsistent with a .45 caliber ammunition.

The evening of the shooting, the police searched Mr. Farrish's residence. Among other things, the police found a letter written to Mr. Farrish from his brother, Joe. The letter stated in part: "I want you to be cool out there. Don't do nothin' stupid. And watch out for them suckas, especially that nigga Slim [*i.e.*, Mr. Cole]."

Mr. Farrish was arrested early morning on May 13, 2008. Mr. Farrish's hands and clothing were tested for gunshot residue. Although there were no traces of such residue on the swab taken from Mr. Farrish's hands, there were particles of such residue on his shorts.

To explain the motive behind the shooting, the prosecution offered several witnesses, including Mr. Cole's twin brother, Tavani Cole. Tavani testified that he and Mr. Cole knew Mr. Farrish and Mr. Farrish's brother, Joe, through school. One day, in March 2005, Mr. Cole told

Tavani, Joe, and a third person (Pierre Hudson) that a man named Rashad Narcisse had paid someone to beat him up. Tavani, Joe, and Mr. Hudson later drove to Mr. Narcisse's house. Joe got out of the car with a gun while Tavani and Mr. Hudson left. Joe later called Tavani and said that he had killed Mr. Narcisse. Subsequently, Tavani, Joe, and Mr. Hudson were arrested. Tavani and Mr. Hudson agreed to plead guilty to accessory manslaughter. Tavani also agreed to testify at Joe's trial but, prior to trial, Joe pled guilty.

According to Tavani and Mr. Cole's mother (Ms. McElveen), during the court proceedings related to the 2005 murder of Mr. Narcisse, Mr. Farrish and a family friend known as Dominic called Mr. Cole a snitch.

According to Tavani, several years later, in February 2008 (*i.e.*, a few months before Mr. Cole was killed), Mr. Cole called Tavani and claimed that Mr. Farrish had tried to kill him by shooting at a rental car he had been driving. Mr. Cole's girlfriend at the time (Razalyn Nickola) also testified at trial about this incident, stating that Mr. Cole had also told her about Mr. Farrish shooting at the rental car. Ms. Nickola eventually informed the police about the shooting, and a police officer confirmed that he had seen bullet holes in the rental car.

The defense's case largely revolved around a self-defense theory. In support of this theory, several witnesses testified, including Albert Broadway. Mr. Broadway testified that, during the relevant period, he was living with his godmother (Angel Montgomery) on Groom. On the day in question, Mr. Broadway and Mr. Farrish were driving in the black car to the house on Groom. When they got to the intersection of Shane and Groom, they saw Mr. Smith and Mr. Cole. Mr. Smith stepped off the curb and displayed a gun. Mr. Broadway thought Mr. Smith was going to kill him so he crouched down in the footwell of the car. Mr. Broadway heard gunshots but he was not sure who was firing. He did not see Mr. Farrish with a gun. At some point, Mr. Farrish's car door opened but Mr. Broadway did not know if Mr. Farrish got out of the car. Eventually, Mr. Farrish sped away, while Mr. Broadway remained crouched in the car footwell until they arrived at his house on Groom.

Mr. Broadway admitted that he did not describe his version of the events to anyone until he talked to a defense investigator about a year and a half after the shooting. However, Ms.

4

Montgomery testified at trial that, the day of the shooting, Mr. Broadway came home looking shaken up and told her that somebody was trying to kill him. Ms. Montgomery also testified that, in February 2008 (*i.e.*, a few months before Mr. Cole was killed), Mr. Farrish and her daughter (also Mr. Farrish's girlfriend) were sitting in front of the house on Groom when a car drove by and shots were fired at the house. According to Ms. Montgomery, Mr. Cole was the driver of the car.

Finally, a woman (Victoria Cook) who had met Mr. Cole through her former boyfriend (Dominique Cole) testified that, on two occasions in 2008, she had been with Mr. Cole, and Mr. Cole stated that he wanted to kill Mr. Farrish. Ms. Cook admitted that she never told the police about Mr. Cole's statement and only told a defense investigator about the incidents in July or September 2009 after Dominique had befriended Mr. Farrish in jail.

In addition to the above testimonial evidence, the defense submitted evidence showing that Mr. Cole had been convicted in 2007 for possession of a concealed weapon by a person previously convicted of the same crime. Also, the parties stipulated to certain facts related to a police officer's search of Mr. Cole's car in 2006. The officer discovered a Colt .45 semiautomatic handgun in the car, and Mr. Cole told the officer that he carried the gun because people were looking to retaliate against him for a murder involving his brother (Tavani).

As noted above, ultimately, the jury convicted Mr. Farrish of murder (with respect to Mr. Cole) and attempted murder (with respect to Mr. Smith). Mr. Farrish appealed but a California appellate court denied the appeal in September 2012. *See Farrish*, 2012 Cal. App. Unpub. LEXIS 6911. In December 2012, the California Supreme Court summarily denied review. *See* Ex. I (order).

In March 2014, Mr. Farrish initiated this habeas case, asserting the same basic claims as he did in his direct appeal. *See* Docket No. 1 (petition). Proceedings, however, were stayed so that Mr. Farrish could exhaust additional claims in state court. *See* Docket No. 6 (order).

In December 2015, Mr. Farrish filed a state habeas petition, asserting that a declaration from an acquaintance (Deaundre Alexander) constituted newly discovered evidence establishing his actual innocence. In April 2016, a state superior court denied the state habeas petition. *See* Resp.'s Ex. J (order). Mr. Farrish thereafter sought relief from an appellate court and the

California Supreme Court. Mr. Farrish's petitions were summarily denied in each instance. *See* Resp.'s Exs. L, Q (docket sheet and order).

Subsequently, the stay of proceedings in the pending action was lifted. *See* Docket No. 17 (order). In November 2016, Mr. Farrish filed an amended habeas petition. The government has responded, and Mr. Farrish has filed a traverse in reply.

## II. <u>DISCUSSION</u>

Mr. Farrish's case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, habeas relief may be granted if the state court proceedings "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States" or resulted in a decision that was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). In the instant case, Mr. Farrish argues only the former – *i.e.*, that the relevant state court decision was contrary to or an unreasonable application of clearly established federal law.

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d

1085, 1091-92 (9th Cir. 2005). "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803; *see also Harrington v. Richter*, 562 U.S. 86, 99 (2011) (stating that, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary"). When the state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Id.* at 102.

A.  <u>Mr. Farrish's Arguments</u>

In his habeas petition, Mr. Farrish makes the following arguments:

(1) That his rights to due process, a fair trial, and an impartial jury were violated because the trial court failed to conduct an inquiry related to comments made by Juror No. 10;

(2) That his right to due process was violated because the prosecution improperly commented on witness credibility during the opening statement and closing argument;

(3) That his right to due process was violated because the trial court did not instruct the jury on how to evaluate evidence of third-party threats against prosecution witnesses;

(4) That his rights to due process and a fair trial were violated because the trial court erroneously instructed the jury that character evidence could be used as evidence of character or propensity (*i.e.*, not for a noncharacter purpose);

(5) That his rights to due process and jury unanimity were violated because the trial court refused to give an instruction on "unanimity of act";

(6) That his due process rights were violated when the trial court refused the jury's request to define the concept of "kill zone" (for the attempted murder charge); and

(7) That the state habeas court violated his right to due process by denying his petition based on actual innocence without an evidentiary hearing.

B.    Juror No. 10's Comments[1]

Mr. Farrish's first argument is that his rights to due process, a fair trial, an impartial jury were violated because the trial court failed to conduct an inquiry related to comments made by Juror No. 10. *See* Am. Pet. at 2. The background for this argument is as follows.

Jury selection began on February 26, 2010. On that day, the trial court instructed the entire venire panel that

> [i]t will be up to you to determine what the facts are in this case, and then you will base that on the evidence that is presented in this courtroom and from no other place, not from the newspaper, not from the TV, not from the Internet, not from friends or family, but from this courtroom and this courtroom only.

Ex. A (RT at 225-26). The trial court further instructed that

> [y]ou may not research this case on the Internet or anywhere else. It is extraordinarily important that you not discuss this case, even the nature of the charges, or anything that you have discovered, what little you have discovered, about it just through the process of the questionnaire or our discussions, with anyone, amongst yourselves, with anyone else, because we'll start this whole process all over again, and you can see already how much time it has taken just to get this far. And we have done a lot of work before you even got here. I can't stress this enough. This takes a tremendous amount of time to give both sides a fair hearing and that's what we're about.
>
> So please take this to heart. Don't discuss it with anyone. Don't do any research. Don't go on Google about this.

Ex. A (RT at 232-33). The trial court repeated similar admonitions during voir dire. *See, e.g.*, Ex. A (RT at 254) ("[W]e need the decision based only on the evidence presented in this courtroom, not from the newspaper article, and not from the Internet."); Ex. A (RT at 254) ("The information, anything that comes from outside, has not been tested."); Ex. A (RT at 268) ("[W]e're going to break . . . . I'm going to remind you each and every time you leave the room, do not discuss the case."); Ex. A (RT at 324) ("[W]e're going to be in recess. . . . [¶] So please remember the admonitions. You may not discuss the case with anyone.").

On Thursday, March 4, 2010, jury selection was completed. *See* Ex. A (RT at 728, 864).

On Monday, March 8, 2010, the Court stated on the record (in the jury's absence) that it

---

[1] It appears that, at the time of the comments, Juror No. 10 was not yet impaneled on the jury and thus was also known as (Prospective) Juror No. 42. *See* Ex. A (RT at 965).

8

had received a letter, purportedly written by an anonymous juror.  *See* Ex. A (RT at 892 *et seq.*).

The content of the letter was as follows:

> March 10, 2010,
>
> Dear Honorable,
>
> All the jurors were instructed not to discuss anything related to our present courtroom issue but [Juror No. 10] was freely telling his lady friend about it during lunch last Tuesday [March 2]!  He was too opinionated about how bad the court system has been managed, and other people around the restaurant tables could also hear him!
>
> Is it OK to talk about our courtroom issues to just a close friend?  Thank you very much for reading this concern.
>
> Respectfully,
>
> A juror.

Ex. B (CT at 673).

To the parties, the trial court commented on the letter as follows:

> I have received in my in-basket in chambers [an] envelope addressed to me by, allegedly, an anonymous juror.  I say "allegedly" because there is no proof that it's from a real juror.  I am very concerned about how I got there, since absolutely no one on my staff, or anyone who has access to my office, says they had contact with any juror, nor with the letter. . . .
>
> . . . .
>
> [The letter] came during a very narrow window of time on Thursday afternoon.
>
> I'm making the letter a part of the record.  And it alleges that one of our prospective – or one of our jury was apparently telling a lady friend about something having to do with the case, although they don't know anything about the case, since we have only gone through jury selection – and was opinionated about how bad the court system has been managed.  I don't know what that means, since the letter doesn't say.
>
> The letter is dated March 10th, which is interesting, since today is March the 8th, and the letter was received on March the 4th.
>
> The grammar is poor in the letter.  The date it – the date of the letter is a different font than the actual letter itself.
>
> I don't give the letter much credence because of all the above facts, and because of the way it was delivered.  I will note for the record that I have told this jury a number of times that if they have any

**United States District Court**
For the Northern District of California

questions about anything, those questions should be directed to my bailiff, who has made himself available, to my bailiff or any of my staff, all of whom have made themselves available. And whoever delivered this did not avail themselves of that, which also makes me suspicious of the validity of this, and that it came actually from a juror.

What I will do is speak with Mr. – the one juror that is named here, and that's the other thing that is puzzling about this. It names the juror by both first and last names, misspelling the name. The only time our jurors were named out loud by both first and last names [was] when my clerk read off those names when they were seated, and that is the only time. And it's not a common name. So in order for someone to remember that name, they would have had to have a pretty extraordinary memory, or had been writing the names down, because our jurors don't have notebooks at this point. So that's a little unusual, to say the least, since the name is hardly common.

So what I'm going to do is inquiry of that juror individually when, that is named in the letter individually, when they come in at 1:30, and then move on, depending on what he has to say.

But as I said, because of the content of the letter, as well as the manner in which I received it, I'm not putting a whole lot of credence in it. I am very concerned about how I received it and how it managed to make it all it [sic] the way into my in-basket in my private chambers without anyone who validly has access to my chambers having any knowledge of it, or having any contact with any of our jurors during that very small window of time when it appeared there.

Ex. A (RT at 892-94).

Later that afternoon, the trial court did question Juror No. 10, as promised. The court informed Juror No. 10 that it had received information that "you were having a conversation during a lunch last Tuesday discussing the court process, and it was with a female friend." Ex. A (RT at 966). Juror No. 10 identified the woman as his wife and stated that (1) "[s]he comes every day with me to the court" and that (2) he was just discussing with her "the process in general. Nothing specific about the case." Ex. A (RT at 967). Juror No. 10 elaborated:

Usually, just about the jury selection process, because that's what I was involved with. You know, about how some people had been there a week in the main 12, and then all of a sudden they got kicked out. So it was kind of interesting, you know, that they would be in the 12 and then out of the 12, so I mentioned that.

Ex. A (RT at 967). Juror No. 10 also referred to discussion of "a few other things about what people do. I mean, you know, one guy works as a math teacher at St. Mary's here. My wife went to St. Mary's in Minnesota. And she even had an application to come here." Ex. A (RT at 967).

10

When the trial court asked if Juror No. 10 had talked about "[a]nything about the case itself or anything that we have discussed here in court," Juror No. 10 responded: "Oh, you know, not to Google, not to look into it in the papers. I guess it came out that it was a murder trial. That's all." Ex. A (RT at 967). In addition, he "said they asked the question about self-defense. I didn't say one way or the other what about it. I just said somebody did ask the question about self-defense. That's all." Ex. A (RT at 968).

After the questioning of Juror No. 10, the trial court denied Mr. Farrish's motion for a mistrial based on the juror's comments and further denied Mr. Farrish's request that Juror No. 10 be removed from the jury and an alternate seated instead. The trial court did agree, however, that an admonishment of some kind was necessary (although it disagreed over the content of the admonishment). *See* Ex. A (RT at 968) (defense counsel asking for an admonishment that "whatever happened during voir dire was perfectly legal, and that's the way the voir dire goes[;] [m]y concern is that he may be holding it against the defense"). The trial court stated:

> [I]t requires an admonishment of all the jurors. I don't want to single him out, because I think that is counterproductive at this point. We're not far enough along where I need to admonish him individually and alienate him. I don't think that he has any way of attributing what I have inquired about to either side [*i.e.*, prosecution or defense]. He has no idea where my questions come from.

Ex. A (RT at 969).

When Mr. Farrish expressed concern that the juror's comments "were directed to the defense use of the peremptories," the trial court responded:

> Well, I think both sides left people on for quite a period of time and then excused them. In fact, the defense passed a number of times and then the People challenged them and vice versa. . . . So I don't think there's any pattern here that can be attributed, and my questions were very neutral and deliberately neutral so that there wasn't an attribution in terms of my questioning to either side.
>
> At this point he acknowledged that he – of what occurred, which is what I was interested in. I wanted to, in a very neutral way, ascertain exactly what happened, what was said, what was not said.
>
> I'm going to admonish the jurors in a rather strong way. I think they have seen him come in by himself. I think he got it, since he was singled out by being hauled in here by himself. I'm going to bring all our jurors in. I'm going to state the admonishment. And it will

also explain why we're going to take a period of time.  We're going to be doing other things, they won't necessarily know that.  And that will take care of it.

Ex. A (RT at 969-70).

When the jury returned to the courtroom, the trial court made the following statement to the jury:

Ladies and gentlemen, before you get comfortable, let me welcome you back.  And let me start out by – this was not how I intended to start out, but let me start out by talking about an issue that I talked about a lot last week during jury selection, and it looks like I have to start out by talking about it again.

I had to start out this afternoon by speaking to one of your number about our admonishment, my admonishment, not to discuss the case with anyone.  And I'm going to have to start out again.

I can't impress upon you enough and – because this has raised an issue that I'm going to have to spend some time before we start the trial now on this this afternoon.

You may not discuss this case with anyone, and even the nature of the charges, anything that does on in this courtroom.  There was an interesting article in the paper about this this weekend.  Cases all across the country now – or courts all across the country now are having to admonish jurors for the very first time not to Google, not to Tweet, not to Face Book, not to blog about the cases that they sit on.  We have never had to do this before.  Cases are having to be tried all over again from scratch, because they're being thrown out of court because of this activity.

You saw how long it took to pick a jury. . . .

It's an unfortunate reality of our world today that there's instant . . . – instant communication.  There's good parts of that in our world, but there are also some consequences of that.  And the consequences of that in our world here are huge.  And it means that we have to start over from scratch if people don't follow the rules about that.  And that includes when you are not here your discussing this case with others.  And that includes talking about the nature of the case, the issues that are involved in this case that you have heard about in this courtroom.

I don't know what else to emphasize to you that you can't talk about those things with your loved ones at home, during our breaks, at work, at the store, at church, at wherever it is that you spend your time.  And I know it's very hard to do.  I know how interesting this stuff is for those who aren't here.  And I know how persistent people can be in wanting to know about it.

The best I can tell you is tell them the Judge said no.  And sometimes that shuts it down.  Because for them it's the Judge said

no.  The answer has to be no, because there's just too much at stake for everybody involved.

I'm going to start adding to my regular instructions that you can't Google, and you can't Tweet, and you . . . – you can't Facebook. You can't do any of those things.

When the case is all over, and I have excused you, then you can do all those things, but not now. . . .

Ex. A (RT at 971-73).

The trial court subsequently excused the jury and made the following comment: "All right, our jury has left.  From the chagrined look on Juror Number 10's face I don't think this is going to be an issue anymore."  Ex. A (RT at 973).

After the jury returned its verdict, Mr. Farrish moved for a new trial, arguing in part that the trial court should have investigated the anonymous letter more thoroughly.  *See* Ex. B (CT at 698); Ex. A (RT at 2614) ("request[ing] at this time that we have an evidentiary hearing to determine, one, who the author of the note was, and, two, whether there was any juror impropriety in the note ending up in the Court's inbox").  In response, the trial court noted that there was

quite a bit of discussion about this on the record after that was discovered.  And frankly, I was not convinced that that necessarily came from a juror.  It appeared in my chambers mysteriously.  We had a lot of discussion about it.  And it could have come from a number of sources, not necessarily a juror.  We never discovered the source of that, and despite the fact that I brought the sheriff's department in to investigate.  I was very concerned, because jurors had absolutely no access to my chambers.  There are limited people who have access to my chambers.

I chose not to highlight it at the time.  There's a full record of our discussions about it, and my decisions with regard to how we were going to handle it.  And my decisions at that time stand.

Ex. A (RT at 2620).

In the pending habeas petition, Mr. Farrish argues that the trial court's actions violated his constitutional rights because the trial court did not investigate whether any other jurors overheard what Juror No. 10 had said and, if so, make an inquiry as to whether that "outside information" affected those jurors' impartiality.  *See, e.g.*, Am. Pet. at 3 (arguing that "[f]ederal due process . . . requires state courts to conduct sufficient inquiry to determine whether jurors will be impartial despite any information they may have seen, heard, or read about a case"; also invoking the right

to an impartial jury).

On direct appeal, the state appellate court does not appear to have addressed Mr. Farrish's argument to the extent it was based on federal law. Rather, the court seems to have focused instead on Mr. Farrish's state law argument only. In this regard, the court held that the lower court had not

> abused its discretion. Even assuming that the note was in fact written by another juror who overheard Juror No. [10's] statements, there is no evidence that Juror No. [10] shared any "outside information." Juror No. [10] told his wife that it was a murder trial and mentioned that someone asked a question about self-defense. But, this was information that any juror present during voir dire would know.

*Farrish*, 2012 Cal. App. Unpub. LEXIS 6911, at *32. As for the California Supreme Court, because it summarily denied Mr. Farrish's appeal, it did not address with any specificity the merits of Mr. Farrish's federal argument.

As noted above, when a state court has denied a federal constitutional claim on the merits without explanation, the federal habeas court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the U.S. Supreme] Court." *Harrington*, 562 U.S. at 102.

Here, the government correctly notes that there is no Supreme Court precedent holding that a trial court has an obligation to hold a hearing on potential juror bias anytime an issue regarding impartiality is raised. *See Sims v. Rowland*, 414 F.3d 1148, 1153 (9th Cir. 2005) (stating that "the Supreme Court has not yet decided whether due process requires a trial court to hold a hearing *sua sponte* whenever evidence of juror bias comes to light"). Indeed, the Ninth Circuit has expressly stated that prior Supreme Court cases "do not stand for the proposition that any time evidence of juror bias comes to light, due process requires the trial court to question the jurors alleged to have bias.' Rather, we concluded that when read in combination, these [prior Supreme Court] cases provide 'a flexible rule.'" *Id.* at 1155 (emphasis added); *see also Tracey v. Palmateer*, 341 F.3d 1037, 1044 (9th Cir. 2003) (stating that "'[a]n evidentiary hearing is not mandated every time there is an allegation of jury misconduct or bias[;] [r]ather, in determining whether a hearing must

14

1  be held, the court must consider the content of the allegations, the seriousness of the alleged

2  misconduct or bias, and the credibility of the source'"").

3       Especially given the flexible approach, this Court cannot say that it was objectively

4  unreasonable for the trial court not to conduct an inquiry into whether other jurors overheard Juror

5  No. 10's comments. Concern about juror impartiality was significantly undercut by several facts:

6  (1) that Juror No. 10's statements did not constitute "outside information" as they referred to

7  matters to which the other jurors were already exposed to (including but not limited to the use of

8  peremptories) and (2) that Juror No. 10's statements were not about the merits of the case (as

9  underscored by the fact that they were made while jury selection was still taking place).

10  Moreover, even if the anonymous letter were to be credited, at best, Juror No. 10 had engaged in

11  limited editorializing, *see* Ex. B (CT at 673) (letter, claiming that Juror No. 10 "was too

12  opinionated about how bad the court system has been managed"), and that was only about the

13  court process itself, and not the merits of the case. Accordingly, Mr. Farrish's request for habeas

14  relief, as related to Juror No. 10's statements, is denied.

15  C.     <u>Prosecutor's Statements Regarding Witness Credibility</u>

16       Mr. Farrish argues next that he is entitled to habeas relief because his right to due process

17  was violated when the prosecutor (1) improperly vouched for the credibility of Mr. Smith (a

18  prosecution witness and alleged victim with respect to the attempted murder charge) and (2)

19  improperly expressed his opinion that Mr. Broadway (a defense witness) was lying. As discussed

20  below, the Court does not find either argument persuasive.

21      1.    <u>Mr. Smith's Credibility</u>

22       With respect to Mr. Smith's credibility, Mr. Farrish criticizes the prosecutor for comments

23  made during both the opening statement and closing argument. In his opening statement, for

24  example, the prosecutor discussed the video-recorded interview of Mr. Smith, taken on the day of

25  the shooting:

26                  Needless to say this was an important person for the police to
                interview. So they take him back to the Richmond police station,

27                  where he is asked to give them the details of what had happened. I
                wish it was not necessary, but unfortunately in this area of town it is

28                  necessary, to surreptitiously videotape folks who are witnesses. And

this is no exception. [Mr.] Smith was videotaped as he was giving his statement to the Richmond police department.

And he tells them pretty much a synopsis of exactly what I have told you. There's no fabricating, there's no lying, there's no need to pull it out of him, he's obviously shook.

Ex. A (RT at 1019-20). According to Mr. Farrish, this comment constituted improper vouching for Mr. Smith's credibility in violation of Mr. Farrish's due process rights.

Then, during closing argument, the prosecutor again focused on the video-recorded interview – especially in light of Mr. Smith's trial testimony where he claimed that he did not remember significant details on the day of the shooting, including who the shooter was:

What about [Mr.] Smith? I mean, he's an actual witness, right? Okay. Certainly, we want to hear what he has to say. [Mr.] Smith. Before we just write off [Mr.] Smith, let's understand [Mr.] Smith for a second. There is no way that you're going to get [Mr.] Smith to come in here to court and give you any kind of cooperative answers, as long as it's a public courtroom and you have got Dominique and D Dog and the boys [*i.e.*, friends and/or associates of Mr. Farrish] all hanging out in the back, there's just no way. And I understand that. . . . There's a reason why the kid has to be taken down there [to the police station] in handcuffs. There's a reason why they videotape it. The rule of law is that we have to put [Mr.] Smith on and let him say what he's going to say, and then, and only then, can we show you the truth in that videotape.

Ex. A (RT at 2474-75). When defense counsel objected, the trial court overruled the objection but, nevertheless, instructed the jury that "this is closing argument. As I have explained to you, the attorneys argue their cases. The arguments aren't evidence." Ex. A (RT at 2475).

The prosecutor then continued:

If you look at his videotape he is non-reflective. It is uncontrived. Words are not being put into his mouth. He is giving a narrative response, and he's giving a response at a point when he is emotional. There isn't time for him to think up a story. Two years haven't gone by.

Ex. A (RT at 2475). The prosecutor added:

Where we take witnesses that we have a pretty good idea, we know that, come down the line, they're going to be have a lot of pressure, and quite frankly, they're going to be uncooperative. So they're videotaped. And when they're videotaped we put them on the stand and then we play the videotape.

. . . It's the videotape that you need to look at. And it's in evidence. But if you look at the video you can see, as I said, that he's uncontrived. He's not spinning his wheels. He's not thinking up

answers. It's essentially unreflective. And I put to you that if [Mr.] Smith had a gun [on that day], in reality, if we were talking about real reality, [Mr.] Smith never would have come back. And [Mr.] Smith never would have talked to the police. And if he had a gun you would have seen him acting the fool on that videotape.

But no, he did come back, and he gave answers in a narrative form by asking him what happened. And if you look at it, if you look at it, you will see at some point Detective Johansen asked him, did [Mr. Cole] have a gun? Now, [Mr. Smith] doesn't know what's out there. [He] doesn't know what they found. But he asked – he was asked, did [Mr. Cole] have a gun. He said, no, he didn't have a gun, he had a bullet.

And then, quite honestly, hiding nothing, he is frank in saying, yeah, [Mr. Cole] got arrested a couple of times with guns. And he stopped carrying them, because he didn't want to get that trigger locked or something. That's right out of his mouth. So he carried the bullet.

Ex. A (RT at 2475).

On direct appeal, Mr. Farrish argued that the above comments by the prosecutor constituted improper vouching for the credibility of Mr. Smith in violation of Mr. Farrish's due process rights. The state appellate court disagreed, stating that

[t]he prosecutor did not improperly vouch for [Mr.] Smith. Rather, the prosecutor simply asked the jury to infer that [Mr.] Smith's statements to police were credible because of [Mr.] Smith's observable demeanor and the fact that he made them so shortly after the shooting. The prosecutor also asked the jury to understand [Mr.] Smith's trial testimony, which did not incriminate [Mr. Farrish], as explained by the fact that his police interview had been circulating in the neighborhood. The prosecutor did not suggest that his belief, that [Mr.] Smith told the police the truth, was based on his own personal investigation rather than the evidence presented at trial. The challenged remarks were fair comment on the evidence . . . .

*Farrish*, 2012 Cal. App. Unpub. LEXIS 6911, at *41.

In evaluating the state appellate court's decision, the Court takes into account that, under Supreme Court authority, a prosecutor can engage in "improper advocacy" and that argument must be confined to "record evidence." *United States v.* Young, 470 U.S. 1, 7, 10 (1985) (noting that "[p]rosecutors sometimes breach their duty to refrain from overzealous conduct by commenting on the defendant's guilt and offering unsolicited personal views on the evidence"). Thus, the Ninth Circuit has explained that, while

prosecutors must have reasonable latitude to fashion closing arguments, and thus can argue reasonable inferences based on the evidence, *including that one of the two sides is lying*[,] . . . a

prosecutorial statement may nevertheless be considered impermissible vouching *if it places the prestige of the government behind the witness* by providing personal assurances of a witness's veracity.

Vouching of that sort is dangerous precisely because a jury may be inclined to give weight to the prosecutor's opinion in assessing the credibility of witnesses, instead of making the independent judgment of credibility to which the defendant is entitled.

*United States v. Weatherspoon*, 410 F.3d 1142, 1144 (9th Cir. 2005) (internal quotation marks omitted and emphasis added).[2] Nevertheless, the Supreme Court has underscored that, to violate due process, a prosecutor's remarks must "'so infect[] the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

In the instant case, it was not unreasonable for the state court to conclude that the prosecutor did not even put the prestige of the government behind Mr. Smith's police interview testimony (as opposed to his trial testimony); instead, the prosecutor argued that the jury should credit Mr. Smith's police interview testimony (over his trial testimony) based on evidence presented at trial – *e.g.*, the fact that Mr. Smith agreed to be interviewed by the police in the first place, how he acted during the interview, and the fact that the interview close in time to the shooting. Moreover, the prosecution did not imply it knew facts beyond those presented to the jury; thus, the prosecutor did not "infect the trial with unfairness." Under these circumstances, habeas relief is not warranted.

2.  Mr. Broadway's Credibility

With respect to Mr. Broadway (a defense witness), Mr. Farrish contends that the prosecutor engaged in misconduct by improperly opining on his lack of credibility during closing argument. The prosecutor made the following comments regarding Mr. Broadway during his opening closing argument:

Well, let's just look at [Mr.] Broadway for a second. [Mr.] Broadway's testimony is tailored. Tailored in this sense means that he's geared his testimony to fit. I find it incredible, absolutely

---

[2] Also, a prosecutor's vouching for the credibility of a witness "can convey the impression that *evidence not presented to the jury, but known to the prosecutor*, supports the charges against the defendant." *Weatherspoon*, 410 F.3d at 1147-48 (internal quotation marks omitted and emphasis added).

incredible, that somebody can come in here and claim that they saw one thing [*i.e.*, Mr. Smith displaying a gun], and then have no perception, no witnessing of anything else. And that one thing is the one thing that they want to use to help the defendant. What am I talking about? Well, he says, I saw [Mr.] Smith with a gun. Now, we had a big demonstration. He had it like this. Wow, sounds like he's a pretty perceptive guy. He has got a good memory. Really. Because according to him he ducks down in the wheel well and has no memory of anything whatsoever after that. Really? . . . .

. . . . Now, is that a [sic] end all, be all point? No. Witnesses can forget and get things wrong and still have an innocent misrecollection. Is that the case with [Mr.] Broadway? Absolutely not. [Mr.] Broadway wasn't even in the car. [Mr.] Broadway doesn't even know how the incident went down. [Mr.] Broadway is coming in here and he's going to say one thing, and then to insulate himself from being able to be cross-examined, to insulate himself from how stupid his story is, he's going to say, I don't know anything after that. Great. Except that is not believable.
There is an instruction where the Judge advises that if a witness has been willfully false you should disregard him, unless you believe from all the circumstances other parts of his testimony. [Mr.] Broadway has been more than willfully false. [Mr.] Broadway is lying.

Ex. A (RT at 2503-04).

Defense counsel then gave her closing argument and, with respect to Mr. Broadway, stated as follows:

[Mr.] Broadway. Let's talk about him for a second. He came here to tell you that [Mr.[ Smith had a gun. You are to consider all facts and circumstances surrounding someone's testimony when evaluating that testimony. [Mr.] Smith said in his taped interview that there was a passenger in the car.

. . . . *Do you think that anybody who wasn't telling the truth would subject themselves to having the prosecution suggest they were an aider and abettor? Subject themselves to criminal prosecution for murder?* To come to court and lie? No.

[Mr.] Broadway risked prosecution to come here and tell you what he saw. Now, nobody would subject themselves. You had heard ad nauseam, ad nauseam, nobody will come testify, snitch. Nobody will come testify. That's right, because they're going to be told they're aiders and abettors. They could be threatened with prosecution. And if they're not threatened with prosecution, they're going to be killed from the streets. Those are the risks that [Mr.] Broadway came to tell the truth. You can take that into account.

Ex. A (RT at 2517-18) (emphasis added).

In his rebuttal closing argument, the prosecutor responded to the above defense comments on Mr. Broadway. The prosecutor stated:

19

> Let's look at a couple of things that the defense attorney said for a second.
>
> First of all, Mr. Broadway. Mr. Broadway comes in here, and we have some high theater here where I'm asking him a question. It's the same question I have been asking him, that is, tell us something, besides your one perception that [Mr.] Smith had a gun. And he says, Aw, I want to talk to my lawyer. And his court appointed counsel walks up there and we have a little talk. That's some high theater right there.
>
> The fact of the matter is the lawyer knows, [Mr.] Broadway knows that there's no way [Mr.] Broadway can ever be prosecuted. You know why? *Because ethically we can't prosecute him. You know why? Because [Mr.] Broadway is lying. I can't prosecute somebody that I know is lying.*

Ex. A (RT at 2542) (emphasis added).

Defense counsel objected, stating that the prosecutor "can't state his opinion of somebody's truth or veracity. That's for the jury and it's misconduct." Ex. A (RT at 2542). Although the trial court overruled the objection, it instructed that, "as I have explained . . . , this is closing argument. You will determine what the facts are. I have given you the law that applies in this case." Ex. A (RT at 2542-43).

The prosecutor then continued:

> If ethically I would put somebody on trial that I did not believe committed a crime, not only would that be something horrible for me to do, but let's figure out what [Mr.] Broadway's defense attorney would say. Wow, he was lying to cover up for his buddy. And you know what, that would be a pretty good defense, wouldn't it?

Ex. A (RT at 2543).[3]

On direct appeal, Mr. Farrish argued that the prosecutor's statements regarding Mr. Broadway constituted misconduct. The state appellate court acknowledged that the prosecutor's statements about Mr. Broadway were "more troubling" compared to his statements about Mr. Smith. *Farrish*, 2012 Cal. App. Unpub. LEXIS 6911, at *39. Notably, the prosecutor had not

---

[3] In his amended petition, Mr. Farrish asserts that the prosecutor was saying that "he could not prosecute defense witness [Mr.] Broadway for perjury." Am. Pet. at 4. However, as indicated by the above excerpts from the record, the prosecutor was clearly referring to prosecution of Mr. Broadway for aiding and abetting murder.

**United States District Court**
For the Northern District of California

simply asked the jury to infer that Mr. Broadway "was lying because of the inherent incredibility of [his] testimony or because [he] was a friend of [Mr. Farrish"; rather, the prosecutor went "beyond" that and told the jury that

> he could not ethically prosecute [Mr.] Broadway as an aider and abettor to murder because he did not believe the testimony. Although that opinion may have been based on the evidence, the problem is that the prosecutor was, in effect, *invoking the reputation of the district attorney's office* to assure the jury that he would not prosecute the innocent.

*Id.* at *41 (emphasis added).

The court, however, noted that the situation before it was different from that presented in another case – where prosecutorial misconduct was found because (1) "the prosecutor invoked the prestige of her office to implicitly assure the jury that the *defendant* [*i.e.*, not a witness] would not have been charged without sufficient evidence of his guilt" and (2) "the prosecutor made *more than just the one suggestion* to the jury that she had additional evidence of [the defendant's] guilt that had not been presented." *Id.* at *43 (emphasis in original and added). Nevertheless, the state appellate court stated, "[e]ven if we were to accept that the prosecutor's remarks in this case were misconduct, they were not prejudicial." *Id.* at *44. First, the trial court "admonished the jury to decide the case on the evidence." *Id.* Second, it was "not reasonably probable that a result more favorable to [Mr.] Farrish would have been reached if the prosecutor had not engaged in [the] single instance of misconduct" – not only because Mr. Broadway's testimony was "inherently suspect when he asserted that he could remember essentially nothing other than [Mr.] Smith having a gun" but also because Mr. Smith's contrary testimony "was corroborated by the physical evidence [*i.e.*, no gun was found near Mr. Cole's body or on the route where he and Mr. Smith ran] and the testimony of [two third-party eyewitnesses] that neither [Mr.] Smith [nor Mr. Cole] had a gun." *Id.* at *45-56.

The state appellate court's conclusion that any prosecutorial misconduct was not prejudicial was not unreasonable. As the government points out, a prosecutor's

> "[i]mproper argument does not, per se, violate a defendant's constitutional rights." "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." Rather,

21

> "[t]he relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"

*Runningeagle v. Ryan*, 686 F.3d 758, 781 (9th Cir. 2012). In *Runningeagle*, the Ninth Circuit took note of a Supreme Court case (*Darden*, 477 U.S. at 168) which held that improper statements by a prosecutor did not deprive the defendant of a fair trial "in part because of the substantial evidence against [the defendant], and because the trial court instructed the jury that the arguments made by counsel were not evidence." *Runnineagle*, 686 F.3d at 781. Here, there was an admonition by the trial court and, more important, there was substantial evidence against Mr. Farrish, most notably (as the state appellate court underscored) independent evidence that corroborated Mr. Smith's version of the events (as expressed during the police interview) over Mr. Broadway's.

D.     Evidence of Third-Party Threats Made to Prosecution Witnesses

According to Mr. Farrish, habeas relief is also warranted because his due process rights were violated when the trial court failed to provide certain instructions to the jury on how to evaluate evidence of third-party threats against prosecution witnesses.

Several prosecution witnesses discussed or referenced threats in their trial testimony. For example:

- *Mr. Smith.* Mr. Smith testified, *inter alia*, that a copy of the police report on the shooting – which had his name on it – was given to him by somebody on the street. *See* Ex. A (RT at 1089). He testified that it made him "[k]ind of angry" to get the police report from somebody on the street. Ex. A (RT at 1089). Mr. Smith equivocated as to whether the fact of his testifying made him worried about his family's safety, *see* Ex. A (RT at 1090, 1092) (at first, stating that "I worry about it, but I don't – I don't see nothing really – no real punishment happening towards them that I would be worried about"; later admitting that he told the police that he could not risk his family); however, he conceded that some people were not "coming around" him because of the police report and that he was worried about people knowing that he was testifying. *See* Ex. A (RT at 1090-92). When defense counsel objected to this line of questioning, the trial court overruled the objection, stating that "[t]his goes to attitude towards testifying." Ex. A (RT at 1089); *see also* Ex. A (RT at

1090) ("Goes to attitude toward testifying.").  Mr. Smith denied that anyone had actually

threatened him because he was testifying.  *See* Ex. A (RT at 1092).

- *Ms. McElveen (Mr. Cole's mother).*  Ms. McElveen testified about, *inter alia*, animosity

  between her family and Mr. Farrish's (including their circle of friends).  For example, in

  2005, when court proceedings were ongoing against Joe (Mr. Farrish's brother) for his

  involvement in the murder of Mr. Narcisse, there was an incident outside the courtroom in

  which Mr. Cole "was called a snitch, and the guys [about fifteen total] were trying to jump

  him and we got into verbal confrontations."  Ex. A (RT at 1156).  The person who called

  Mr. Cole a snitch was a man named Dominic.  *See* Ex. A (RT at 1157).  Both Dominic and

  Mr. Farrish were involved with the "jumping" of Mr. Cole.  *See* Ex. A (RT at 1157-59).

  Ms. McElveen further testified that, sometime in 2008, apparently while court proceedings

  were ongoing against Mr. Farrish, Dominic threatened her, saying that "that's what my son

  get, the nigger is six feet under and your ass is going to be six feet under also."  Ex. A (RT

  at 1161).  Dominic was in the courtroom while Ms. McElveen was testifying.  *See* Ex. A

  (RT at 1159-60).  Finally, Ms. McElveen testified that she had had a conversation with Mr.

  Smith prior to trial during which he stated that he did not want to testify because a police

  report "had gotten out into the street and [was] circulating around [the neighborhood]."

  Ex. A (RT at 1168).  The trial court specified that Ms. McElveen's testimony about Mr.

  Smith was "merely . . . evidence of Mr. Smith's state of mind and his attitude towards

  testifying.  For that purpose only."  Ex. A (RT at 1167).

- *Tavani (Mr. Cole's brother).*  Tavani testified, *inter alia*, that he had received threats

  regarding his testifying in the case: "I received phone calls [about three] saying I'd be

  killed."  Ex. A (RT at 1435).  He also testified that he reported the calls to the District

  Attorney's Office.  *See* Ex. A (RT at 1436).  The trial court instructed that jury that "[t]his

  testimony . . . goes to this witness's attitude towards testifying, not necessarily for the truth

  of the statements, but as to the witness's attitude towards testifying and coming to court."

  Ex. A (RT at 1435).  Tavani clarified that Mr. Farrish himself had never threatened him.

  *See* Ex. A (RT at 1444).

1    According to Mr. Farrish, "the jury should have been instructed that the evidence [of]

2    threats could only be considered for [the] purpose" of "explain[ing] the prosecution witnesses'

3    reluctance to testify." Am. Pet. at 7. Mr. Farrish contends that, without a limiting instruction, "the

4    jurors would probably have inferred that [he] had directed the . . . attempts to intimidate witnesses

5    and suppress their testimony, an improper purpose absent evidence to that effect." Am. Pet. at 7.

6    Mr. Farrish further contends that a certain instruction, CALCRIM No. 371, Alternative C,[4] should

7    have been given to the jury, as that instruction informs the jury that "absent evidence that [a

8    defendant] knew of or approved the suppression attempts by third persons, the jury could not use

9    that testimony against [the defendant]," in particular, "to infer a consciousness of guilt from such

10   threats." Am. Pet. at 8.

11   On direct appeal, the state appellate court did not find Mr. Farrish's argument compelling,

12   explaining that

> no one requested that the jury be instructed as to when
> consciousness of guilty could be inferred from attempts to suppress
> evidence. Such a purpose was never suggested by the prosecutor.
> Instead, the trial court explained to the jury, on several occasions,
> that such evidence was only to be used to help explain the
> witnesses' state of mind.

17   *Farrish*, 2012 Cal. App. Unpub. LEXIS 6911, at *51. The court acknowledged that, "[o]n one

18   occasion, when [Ms.] McElveen testified regarding Dominic's threat to her, the jury was not

19   immediately admonished regarding the limited purpose for which such testimony could be

20   considered." *Id.* at *52. But the court concluded that, "even if this constituted error, any such

21   error was harmless" because "the case against [Mr. Farrish] was strong. It is not reasonably

---

[4] CALCRIM No. 371, Alternative C, provide as follows:

> If someone other than the defendant tried to create false evidence,
> provide false testimony, *or conceal or destroy evidence*, that
> conduct may show the defendant was aware of (his/her) guilt, but
> only if the defendant was present and knew about that conduct, or, *if
> not present, authorized the other person's actions*. It is up to you to
> decide the meaning and importance of this evidence. However,
> evidence of such conduct cannot prove guilt by itself.

1-300 CALCRIM 371 (emphasis added).

24

probable the jury would have reached a different verdict absent the error." *Id.*

The Court is not unsympathetic to Mr. Farrish's contention that the failure to instruct along the lines of CALCRIM No. 371, Alternative C, was problematic, particularly with respect to Ms. McElveen's testimony that a specific person – Dominic – had threatened her in or about 2008. *Compare Farrish*, 2012 Cal. App. Unpub. LEXIS 6911, at *51 (discussing state court opinion where threat was made by an unidentified person). The fact that Dominic was apparently a good friend of Mr. Farrish, and one who had previously engaged in joint effort with Mr. Farrish in "jumping" Mr. Cole in 2005, might lead to an inference that the 2008 threat made by Dominic was at the behest of Mr. Farrish. Moreover, even the state appellate court noted that there was no limiting instruction by the trial court with respect to this specific testimony by Ms. McElveen.

Nevertheless, under the AEDPA standard, the Court must evaluate the state appellate court's conclusion for unreasonableness, and, here, it was not objectively unreasonable for the state appellate court to ultimately conclude that, even if there were a due process violation, the error was harmless because the evidence against Mr. Farrish was substantial. Under *Brecht v. Abrahamson*, 507 U.S. 619 (1993), habeas relief is proper "only if the failure to give the . . . instruction 'had a substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 637; *cf. Clark v. Brown*, 442 F.3d 708, 726 (9th Cir. 2006) (concluding that the failure to give a jury instruction violated due process but asking whether the violation was "harmless"). As indicated above, Mr. Farrish's primary defense at trial was self-defense but that argument was severely undercut by the testimony of Mr. Smith, who testified that neither he nor Mr. Cole was carrying a weapon at the time, and Mr. Smith's testimony was corroborated both by the physical evidence (*i.e.*, no gun was found) as well as the testimony of two independent third-party eyewitnesses.

E. Character Evidence

Mr. Farrish asserts that habeas relief is warranted because his rights to due process and a fair trial were violated when the trial court erroneously instructed the jury that character evidence could be used as evidence of propensity.

Mr. Farrish's argument relates to California Evidence Code §§ 1101 and 1103.

25

- Section 1101 provides in relevant part that, "[e]xcept as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." Cal. Evid. Code § 1101. In other words, "[e]vidence of a person's character, also known as propensity evidence, is inadmissible to prove conduct in conformity with that character trait." *People v. Villatoro*, 54 Cal. 4th 1152, 1170 (2012) (Corrigan, J., dissenting); *see also People v. Carter*, 36 Cal. 4th 1114, 1147 (2005) (stating that "[c]haracter evidence is not admissible to show conduct on a specific occasion[;] [t]his type of evidence sometimes is referred to as evidence of criminal disposition or propensity").

- Section 1103 is one of the exceptions identified in § 1101. It has two relevant parts: one related to a victim of a crime and one related to the accused of a crime.

  - Section 1103(a) provides in relevant part that, "[i]n a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by Section 1101 if the evidence is," *e.g.*, "[o]ffered by the defendant to prove conduct of the victim in conformity with the character or trait of character. Cal. Evid. Code § 1103(a)(1).

  - In turn, under § 1103(b), if "evidence that the *victim* had a character for violence or a trait of character tending to show violence has been adduced by the defendant under paragraph (a) of subdivision (a)," then "evidence of the *defendant's* character for violence or trait of character for violence (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) is not made inadmissible by Section 1101 if the evidence is offered by the prosecution to prove conduct of the defendant in conformity with the character or trait of character." *Id.* § 1103(b).

In the instant case, Mr. Farrish offered evidence that Mr. Cole, in particular, had a

character for violence – *e.g.*, that, in February 2008, Mr. Farrish and his girlfriend were sitting in front of his godmother's house on Groom when a car drove by, which Mr. Cole was driving, and shots were fired at the house.

Based on the defense evidence of Mr. Cole's character for violence, the prosecution, relying on § 1103(b), introduced evidence of Mr. Farrish's character for violence, more specifically, that, in 2006, Mr. Farrish pulled a gun on a third party as part of a robbery undertaken with three other people. Before the prosecution introduced this evidence, the trial court instructed that the evidence was for a limited purpose only and that it would later give instructions as to what that limited purpose was. *See* Ex. A (RT at 2265, 2292). However, the trial court failed to give such an instruction, thus prompting the jury to ask the court about the limited purpose during its deliberations. *See* Ex. B (CT at 658) (jury question) ("On 3/25, during rebuttal case, in morning, Josh Atkinson, Walter Welsch, & Hill testified about S. Farrish pulling gun at a party. The Judge indicated this testimony was for a limited purpose, which she would explain later. She never did. For what purpose was this testimony allowed?").

Because the judge presiding over the trial was not available, another judge was called upon to answer the jury's question. The judge responded to the question with an instruction that was a modified version of CALCRIM No. 1191, which is the pattern instruction on evidence of prior sex crimes admitted under California Evidence Code § 1108.[5] The instruction given to the jury was as

---

[5] The current version of CALMCRIM No. 1191A, which addresses evidence of an uncharged sex offense, provides as follows:

> The People presented evidence that the defendant committed the crime[s] of <insert description of offense[s]> that (was/were) not charged in this case. (This/These) crime[s] (is/are) defined for you in these instructions.

> You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense[s]. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.

> If the People have not met this burden of proof, you must disregard this evidence entirely.

1   follows:

2   The People presented evidence that the defendant has a violent
    character.
3

4   You may consider this evidence only if the People have proved by a
    preponderance of the evidence that the defendant in fact has a
    character for violence. Proof by a preponderance of the evidence is
5   a different burden of proof from proof beyond a reasonable doubt.
    A fact is proved by a preponderance of the evidence if you conclude
6   that it is more likely than not that the fact is true.

7   If the People have not met this burden of proof, you must disregard
    this evidence entirely.
8

9   If you decide that the defendant has a violent character, you may,
    but are not required to, conclude from that evidence that the
    defendant was disposed or inclined to commit crimes of violence,
10  and based on that decision, also conclude that the defendant was
    likely to commit and did commit murder and attempted murder as
11  charged here. If you conclude that the defendant has a character for
    violence, that conclusion is only one factor to consider along with
12  all the other evidence. It is not sufficient by itself to prove that the
    defendant is guilty or murder or attempted murder. The People must
13  still prove each charge and allegation beyond a reasonable doubt.

14  Ex. B (CT at 654).

15      The state appellate court rejected Mr. Farrish's contention, on direct appeal, that the above

16  instruction violated his right to due process. It cited in support a decision issued by the California

17  Supreme Court, in which that court stated: "'We cannot say that, in providing for the jury to obtain

18  a balanced view of the possible violent tendencies of both the victim and the defendant, the

19  Legislature ran afoul of any fundamental conception of justice embodied in the federal

20  Constitution'" – particularly because the defendant has "'the choice whether evidence of his or her

21

22  _____

    If you decide that the defendant committed the uncharged
23  offense[s], you may, but are not required to, conclude from that
    evidence that the defendant was disposed or inclined to commit
24  sexual offenses, and based on that decision, also conclude that the
    defendant was likely to commit [and did commit] <insert charged
25  sex offense[s]>, as charged here. If you conclude that the defendant
    committed the uncharged offense[s], that conclusion is only one
26  factor to consider along with all the other evidence. It is not
    sufficient by itself to prove that the defendant is guilty of <insert
27  charged sex offense[s]>. The People must still prove (the/each)
    (charge/ [and] allegation) beyond a reasonable doubt.

28  1-1000 CALCRIM 1191A.

violent propensity will be admissible.'" *Farrish*, 2012 Cal. App. Unpub. LEXIS 6911, at *64 (quoting *People v. Fuiava*, 53 Cal. 4th 622 (2012)). Furthermore, the defendant's character for violence "must be relevant to a material issue in the trial," *id.*, and a trial court retained discretion to bar such character evidence for undue prejudice. *See id.* at *65. The state appellate court also underscored that "the jury was instructed that evidence of [Mr. Farrish's] violent character was not sufficient by itself to prove [his] commission of the charged offenses, and that the People must still prove each charge beyond a reasonable doubt," and so "the jury could not have interpreted the instructions as authorizing a guilty verdict based solely on proof of the uncharged conduct. Nor could a reasonable jury have interpreted the instructions as authorizing conviction of the charged offenses based on a preponderance of the evidence standard." *Id.* at *66-67.

The state appellate court's conclusion was not objectively unreasonable. This is especially so because "the United States Supreme Court has never held that the introduction of propensity . . . evidence violates due process." *Maldonado v. Frauenheim*, No. 15-cv-03002-EMC, 2017 U.S. Dist. LEXIS 47059, at *46 (N.D. Cal. Mar. 29, 2017) (citing various Ninth Circuit cases relying on *Estelle v. McGuire*, 502 U.S. 62 (1991)); *see also Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006) (stating that "[w]e cannot conclude that the Nevada Supreme Court acted in an objectively unreasonable manner in concluding that the propensity evidence introduced against [the defendant] did not violate due process, given that *Estelle* expressly left this issue an 'open question'"). Moreover, it was not unreasonable for the state appellate court to find no due process violation given that – as the court itself noted – evidence as to the defendant's character for violence could be admitted only if the defendant first chose to implicate the victim's character for violence. Accordingly, habeas relief on the ground of an allegedly improper instruction on propensity evidence is not warranted.

F.     No Instruction on "Unanimity of Act"

Mr. Farrish's next contention is that he is entitled to habeas relief because his rights to due process and jury unanimity were violated when the trial court refused to give an instruction on "unanimity of act." The instruction that Mr. Farrish asked the trial court to give was CALCRIM No. 3500 which provides as follows:

> The defendant is charged with *<insert description of alleged offense>* [in Count ] [sometime during the period of _____ to _____].
>
> The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed.

2-3500 CALCRIM 3500.

Mr. Farrish asserts that this instruction was warranted based on the following:

(1) There were two possible crimes scenes – *i.e.*, the fatal shot could have been fired at Groom (where the shooting began) or it could have been fired at Gilma (where Mr. Cole's body was eventually found).[6]

(2) Based on Mr. Broadway's testimony that Mr. Smith displayed a gun first, Mr. Farrish "likely had the right to fire in self-defense at the Groom crime scene," but not at the Gilma crime scene where "the evidence indicated that [Mr.] Cole was running away while being fired upon." Am. Pet. at 12.

(3) Therefore, it is possible that some jurors found Mr. Farrish guilty because the fatal shot was fired *at Groom* and Mr. Farrish was not acting in self defense, while other jurors found Mr. Farrish guilty because, even though Mr. Farrish was acting in self-defense at Groom, he fired the fatal shot *at Gilma* while Mr. Cole was running away (with no self-defense option being available here).[7]

As the trial court noted, Mr. Farrish's basic position here is that the jury had to be unanimous about which bullet caused Mr. Cole's death – *i.e.*, one shot at Groom or one shot at Gilma. *See* Ex. A (RT at 2368-69).

The state appellate court was not persuaded by Mr. Farrish's argument. It

---

[6] According to Mr. Cole, the fatal shot could have been fired at Groom since a jury could have found that Mr. Cole was shot there and then "managed to run 217 feet to Gilma and climb over a fence before dying." Am. Pet. at 12.

[7] Given this argument, Mr. Farrish seems to be challenging here only the charge of murder (as to Mr. Cole) only and not the charged of attempted murder (as to Mr. Smith). This is also supported by the appellate brief that he filed in state court. *See* Ex. D (Op. App. Br. at 91).

agreed with the trial court that the jury was not required to agree unanimously on which bullet killed [Mr. Cole]. There were not two distinct murders. Although there were two crime scenes, there was only a single discrete criminal event – the murder of [Mr. Cole] – regardless of which bullet in the sequence of shots actually killed him. Whether the fatal bullet was fired on Groom or on Gilma only concerns the way in which the crime was committed. No unanimity instruction is required "'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.'"

*Farrish*, 2012 Cal. App. Unpub. LEXIS 6911, at *70-71.

The state appellate court's conclusion was not objectively unreasonable.

In the ordinary case, a general unanimity instruction suffices to instruct the jury that they must be unanimous on whatever specifications form the basis of the guilty verdict. A specific unanimity instruction is required only when it appears that "there is a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts."

*United States v. Kim*, 196 F.3d 1079, 1082 (9th Cir. 1999). Here, Mr. Farrish makes a "different acts" argument, but it was not unreasonable for the state appellate court to hold that (1) Mr. Farrish glossed over the distinction between (a) different *acts* and (b) different *means* to accomplish a criminal act and that (2) which bullet killed Mr. Cole fell into the category of different means. *See United States v. Gonzalez*, 786 F.3d 714, 716-17 (9th Cir. 2015) (rejecting defendant's argument that the trial court should have instructed the jury that it must unanimously agree on the facts that constituted the conspiracy to murder; acknowledging that "different jurors may have concluded that different particular overt acts" with respect to the conspiracy, but stating that "no unanimity problem would arise because the differences of opinion on a particular overt act . . . are ones only of means"). *See, e.g.*, *United States v. Ruiz*, 710 F.3d 1077, 1080-82 (9th Cir. 2013) ("find[ing] no error in the district court's failure to give a specific unanimity instruction"; the defendant was charged with possession of a firearm and ammunition during one ten-minute period on one night in one location, and, "[w]hile numerous witnesses testified that [the defendant] possessed the shotgun and ammunition at different times throughout that ten minute period, the jurors were free to convict on whichever evidence they believed supported [his] guilt beyond a reasonable doubt, even if they failed to reach agreement on which pieces of evidence were ultimately persuasive"); *United States v. Morsette*, 653 F. App'x 499, 503 (9th Cir.

31

2016) (concluding no plain error where trial court gave only a general and not a specific unanimity instruction; stating that, "[w]hen the government argues that the defendant employed several 'means' to accomplish a criminal act, . . . a general unanimity instruction may be sufficient" and, here, "[t]he government alleged that [the defendant] used several means to embezzle, steal or convert the RBHB's funds – it did not charge each improper transaction as a separate crime").

*United States v. Echeverry*, 719 F.2d 974 (9th Cir. 1983), a case cited by Mr. Farrish in his petition, is not to the contrary. There, there were potentially different acts at issue (instead of different means) because there was evidence that there was a conspiracy to distribute drugs on different *dates*. *See United States v. Echeverry*, 698 F.2d 375, 377 (9th Cir. 1983) ("We have no means by which we may be certain that some portion of the jury, in casting a guilty ballot, did not envision a December conspiracy and fail to find enough evidence to believe that there was a June conspiracy, while other jurors envisioned a June conspiracy and not a December conspiracy. We are not free to hypothesize whether the jury indeed agreed to and was clear on the duration of a single conspiracy or of multiple conspiracies."). Because different dates and different conspiracies were involved, the case is inapposite.

G.    Definition of "Kill Zone"

Mr. Farrish contends next that his due process rights were violated when the trial court refused the jury's request to define the concept of "kill zone" for the attempted murder charge (*i.e.*, the attempted murder of Mr. Smith).

The instruction on attempted murder stated in relevant part as follows:

> CALCRIM 600.  ATTEMPTED MURDER (Pen. Code, §§ 21a, 663, 664)
>
> The defendant is charged in Count Two with attempted murder.
>
> To prove that the defendant is guilty of attempted murder, the People must prove that:
>
> 1.    The defendant took at least one direct but ineffective step toward killing another person;
>
> AND
>
> 2.    The defendant intended to kill that person.

. . . .

> A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or "kill zone." In order to convict the defendant of the attempted murder of [Mr.] Smith, the People must prove that the defendant not only intended to kill [Mr.] Cole but also either intended to kill [Mr.] Smith, or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill [Mr.] Smith or intended to kill [Mr.] Cole by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [Mr.] Smith.

Ex. B (CT at 629).

As Mr. Farrish notes, "[t]he prosecution's theory of attempted murder of [Mr.] Smith was not [because Mr. Farrish] . . . specifically targeted [Mr.] Smith but because he fired at a 'kill zone' and intended to kill everyone within that zone." Pet. at 14; *see also* Ex. A (RT at 2504-05 (prosecutor arguing to jury in closing argument, "You just told us that he was trying [to] kill [Mr.] Cole, and you have charged [Mr.] Smith as a victim of attempted murder"; explaining that there is a "zone of risk" – "if the bystander is in the zone of risk, then that's attempted murder on the bystander").

During deliberations, the jury asked: "What is the definition of a 'kill zone'?" Ex. B (CT at 660). The trial court's response was: "The term 'kill zone' is defined in CALCRIM 600 as a particular zone of harm. I cannot provide a more specific definition. As noted in the instructions, terms not specifically defined are to be given their ordinary meaning. This is a factual issue for the jury to decide." Ex. B (CT at 660).

Mr. Farrish argues that the trial court could have provided a more specific definition – *i.e.*, CALJIC 8.66.1 – and that failure to do so violated his due process rights. CALJIC 8.66.1 provides as follows:

> "A person who primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. [This zone of risk is termed the 'kill zone.'] The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to kill the primary victim by killing everyone in that victim's vicinity. [¶] Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a ['kill zone'][zone of risk] is an issue to be decided by you."

*People v. Stone*, 46 Cal. 4th 131, 137-38 n.1 (2009) (quoting CALJIC No. 8.66.1). Thus, Mr.

Farrish's argument boils down to the position that the trial court should have explained to the jury that "kill zone" had to do with the vicinity of Mr. Cole. *See* Am. Pet. at 14 ("Had the court provided the jury with this proper instruction, it would have correctly focused the jury on deciding at what times [Mr.] Smith was in [Mr.] Cole's 'vicinity,' and whether [Mr. Farrish] was firing shots at [Mr.] Cole at those times."). According to Mr. Cole, "[l]eaving the zone completely undefined permitted the jury to use its own definition of a kill zone, which may or may not have been correct." Am. Pet. at 15.

The state appellate court did not find Mr. Farrish's argument compelling:

> [Mr. Farrish] complains that the trial court did not provide the definition of "kill zone" provided in CALJIC No. 8.66.1. But, our Supreme Court has instructed that the "'kill zone' theory 'is not a legal doctrine requiring special jury instructions . . . . Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others.'"

> In any event, although the trial court did not use the precise words used in CALJIC No. 8.66.1, we think the instructions given to the jury make clear that a "kill zone" is the vicinity in which the defendant intends to kill anyone present.

*Farrish*, 2012 Cal. App. Unpub. LEXIS 6911, at *80. The court also indicated that it was highly unlikely – as suggested by Mr. Farrish – that the jury could have found attempted murder of Mr. Smith based on the shots that Mr. Farrish fired at Mr. Cole on Gilma because "the prosecutor made clear, in his argument, that '[t]he attempted murder is for the shots on Groom,'" where, undisputedly, Mr. Cole and Mr. Smith were in close proximity to one another (*i.e.*, before they split up). *Id.* at *81.

The state appellate court's reasoning here was not an unreasonable application of clearly established federal law. As a preliminary matter, it is not clear that "vicinity" (the basic term for which Mr. Farrish advocated) is any more precise than "zone of harm" (the term used to explain kill zone in the instruction given to the jury). Moreover, the trial court correctly noted that the parameters of a kill zone is a factual question, and therefore additional specificity with respect to definition of the term is not clearly possible or helpful (in fact, may even be harmful). *See People v. Pham*, 192 Cal. App. 4th 552, 559 (2011) ("The question – which is a factual one for the jury to

34

decide – is whether, based on the particular evidence in the case, it can be inferred that defendant had the concurrent intent to kill not only his intended target but others in the target's vicinity."). Mr. Farrish fails to establish that the state court violated clearly established federal law by concluding that the failure to instruct did not impinge on his right to due process.

H.    Actual Innocence

Finally, Mr. Farrish contends that that the state habeas court violated his right to due process by denying his petition based on actual innocence without even an evidentiary hearing. Mr. Farrish's claim of actual innocence was based on a declaration submitted by a friend, Deaundre Alexander. In his declaration, Mr. Alexander testified, *inter alia*, that:

- Mr. Cole was a member and leader of a "crew" known as TNA. Alexander Decl. ¶ 3.
- Tavani (Mr. Cole's brother) was also a member of TNA, as was Mr. Hudson – the two individuals who, along with Mr. Farrish's brother, Joe, were involved in the murder of Mr. Narcisse. *See* Alexander Decl. ¶¶ 4-6.
- Mr. Farrish "was angry that TNA had turned on his brother and made it known that TNA was a bunch of snitches," which "ruined the reputation of TNA." Alexander Decl. ¶ 8.
- In response, TNA "started telling everyone that they would 'come after' [Mr. Farrish and] made threats against him and his family." Alexander Decl. ¶ 9.
- Two months before the May 2008 shooting, Mr. Cole talked to Mr. Alexander about Mr. Farrish's disparagement of TNA. After Mr. Alexander stated that he was "siding with" Mr. Farrish, Mr. Cole told Mr. Alexander that should give Mr. Farrish "'some space'" and that he was 'on him,'" which meant that "TNA was looking to follow through with their threats and silence [Mr. Farrish] by shooting him and that [Mr. Alexander] should stay away from [Mr. Farrish]." Alexander Decl. ¶ 10. Mr. Alexander told Mr. Farrish about the conversation and tried to give Mr. Farrish "a gun because [he] knew [Mr. Cole] had an AR-15." Alexander Decl. ¶ 10. But Mr. Farrish did not like to carry guns – in fact, had accidentally shot himself in the leg when handling one. *See* Alexander Decl. ¶ 11.
- The day that Mr. Cole was killed, Mr. Alexander "again spoke to [Mr. Farrish] about [Mr. Cole] and how [Mr. Alexander] believed [Mr. Cole] was looking to shoot [Mr. Farrish]."

Alexander Decl. ¶ 13.

According to Mr. Farrish, the declaration of Mr. Alexander establishes that Mr. Farrish "is factually innocent of the first degree murder charge [or at most is guilty of a lesser offense] because he shot Mr. Cole in self-defense"; "no reasonable juror would have convicted him in light of this new evidence" because it reflected that Mr. Farrish was "aware of numerous threats against his life, when he shot Mr. Cole" and that Mr. Cole was armed at the time of the shooting and was actively seeking out Mr. Farrish. Am. Pet. at 16-17, 19. Mr. Farrish asserts that he is entitled to habeas relief because the state court did not issue an order to show cause (which it should have because the contents of the declaration, if accepted as true, established a prima facie case of actual innocence or guilt of a lesser offense) and further failed to "order an evidentiary hearing on the issue." Am. Pet. at 20, 22.

The state habeas court apparently found an order to show cause or evidentiary hearing unnecessary because, although "[r]eading the habeas petition and the Declaration of Alexander in a vacuum[,] one might easily be persuaded of the reasonableness of [Mr. Farrish's] perception of both the imminence of danger on the day he fired at [Mr. Cole] and the need to resist with the degree of forced applied[,] . . . the actual facts before the jury belie any such facile interpretation." Ex. J (Order at 7). The full record reflected that "both [Mr. Farrish] was trying to shoot and kill [Mr.] Cole and that [Mr.] Cole and [Mr.] Smith, in turn, were trying to kill [Mr. Farrish]. In other words, these individuals were individually and collectively engaged in a blood feud based on past personal disputes between them . . . ." Ex. J (Order at 7).

The state habeas court added that it found no merit to Mr. Farrish's assertion that he could have presented a better self-defense theory with the Alexander declaration because "there is no reason to believe that the currently articulated augmented defense based on [the] Declaration is anything more than cumulative of the self-defense claim made at [the] jury trial." Ex. J (Order at 10).

The state habeas court's denial of post-conviction relief was not unreasonable. First, "[g]iven the lack of a holding from the U.S. Supreme Court that there is a constitutional right to release based upon a showing of actual innocence, the [court's] rejection of [Mr. Farrish's] claim

United States District Court
For the Northern District of California

cannot be said to be 'contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Gonzalez v. Gipson*, No. 14-cv-04995-EMC, 2016 U.S. Dist. LEXIS 70803, at *35 (N.D. Cal. May 31, 2016); *see also McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) (noting "[w]e have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence"); *DA's Office v. Osborne*, 557 U.S. 52, 71 (2009) (stating that whether a federal constitutional right to be released upon proof of actual innocence "is an open question"); *Garnett v. Neven*, 408 Fed. Appx. 47, 47 n.1 (9th Cir. 2011) (stating that "the Supreme Court has not clearly established whether a freestanding claim of actual innocence exists").

But even if a federal habeas claim could be predicated on a freestanding actual innocence claim, *see Jones v. Taylor*, 763 F.3d 1242, 1246 (9th Cir. 2014) (stating that "[w]e have not resolved whether a freestanding actual innocence claim is cognizable in a federal habeas corpus proceeding in the non-capital context, although we have assumed that such a claim is viable"); *see also Moore v. Arnold*, No. 16-01666 EJD (PR), 2016 U.S. Dist. LEXIS 97601, at *5 (N.D. Cal. July 26, 2016) (stating that "it appears that a noncapital prisoner can state a freestanding actually innocence claim in federal habeas based on the Ninth Circuit's recent decisions"), "the threshold showing for such an assumed right would necessarily be extraordinarily high.'" *Murray v. Hubbard*, No. C-11-2943 EMC (pr), 2012 U.S. Dist. LEXIS 131716, at *4 (N.D. Cal. Sept. 14, 2012). "[A] habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger v. Stewart*, 132 F.3d 463, 476 (9th Cir. 1997).

The Alexander declaration, added to the other evidence of self-defense presented at trial, does not support probable innocence on the part of Mr. Farrish. As the government emphasizes, Mr. Alexander never claimed to have any personal knowledge of the shooting. The main witnesses who had personal knowledge or at least who claimed personal knowledge were Mr. Smith (a prosecution witness) and Mr. Broadway (a defense witness). Mr. Smith's trial testimony, of course, was belied by his more specific police interview testimony; and Mr. Smith's testimony in the police interview – that Mr. Smith and Mr. Cole were not carrying any weapons on the day at

issue – was in fact corroborated by physical evidence (no guns were found at the scene) and the testimony of two independent third-party eyewitnesses. Mr. Farrish protests that the Alexander declaration, unlike the other self-defense evidence tendered at trial (*e.g.*, "specific instances where Mr. Cole and TNA members attacked [him]"), is special and noncumulative because it "goes directly to [his] understanding of the threats made against him by Mr. Cole." Am. Pet. at 18-19. But even accepting that understanding, that does not detract from the fact that there was substantial evidence that, on the day of the shooting, neither Mr. Smith nor Mr. Cole had a gun.

### III.  CONCLUSION

For the foregoing reasons, the Court denies Mr. Farrish's amended petition for habeas relief. In addition, the Court declines to issue Mr. Farrish a certificate of appealability. This is not a case in which "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The Clerk is instructed to enter judgment and close the file.

**IT IS SO ORDERED**.

Dated: September 14, 2017

_____
EDWARD M. CHEN
United States District Judge